**In re W/B ASSOCIATES, Debtor.**

**Robert O LAMPL, Movant,**

v.

**NO RESPONDENT, Respondent.**

**Bankruptcy No. 98–21139 JKF.**
**Motion No. ROL–5**
**Related Motion No. ROL–1**

United States Bankruptcy Court,
W.D. Pennsylvania,
Pittsburg Division.

Nov. 23, 1998.

Robert O Lampl, Pittsburgh, PA, pro se.

Charles Knoll, Pittsburgh, PA.

Olivia J. Lorenzo, Pittsburgh, PA, for Debtor.

John R. O'Keefe, Pittsburgh, PA.

George Cheever, Kirkpatrick & Lockhart, Pittsburgh, PA, for Baldwin and Associates and W/B Funding.

Philip J. Uher, Doepken, Keevican & Weiss, Pittsburgh, PA, for RTA Group.

Edward C. Leckey, Pittsburgh, PA, pro se.

Robert J. Ridge, Pittsburgh, PA.

## MEMORANDUM OPINION AND ORDER[1]

JUDITH K. FITZGERALD, Bankruptcy Judge.

AND NOW, to-wit, this **23rd** day of **November, 1998**, before the court is Robert O Lampl's Motion for Reconsideration of an order denying him a broker's commission.

■ Lampl contends in ¶¶ 3–6 of his Motion that this court's November 5, 1998, Memorandum Opinion erroneously concludes that Lampl did not represent a creditor at the sale hearing, because he stated at the hearing that he did represent a creditor. This allegation is a red herring. Since the date of the sale hearing (March 13, 1998) and the date of the Memorandum Opinion (November 5, 1998), all of the claims against the

estate have been adjudicated or settled with few exceptions that are not relevant to Lampl's clients. At the time the November 5, 1998, Memorandum Opinion and Order were issued Lampl's clients were known not to be creditors of this estate.[2]

The "creditor" that Movant purports to represent was identified at the sale hearing on March 13, 1998, as "Vincler & Knoll and Charles Knoll, Trustee for the Judgment of Ted Paul." This entity, at best, had a derivative claim against this estate, as it articulated in many hearings in this court. Page 31 of the Transcript of the March 13, 1998, hearing reflects this status and includes the recognition by Mr. Lampl that "I'm wearing two hats. Both clients are aware of that and I don't see any conflict. With regard to my representation of a creditor, *it's a derivative, indirect creditor....*" (Emphasis added.)

■ Lampl's clients (i.e., Vincler & Knoll and Charles Knoll) are alleged creditors of entities that may hold claims against this estate. Neither is a direct creditor of this estate, nor has either claimed to be. Charles Knoll is a lawyer who practices with the law firm of Vincler & Knoll. Ted Paul was once a client of or involved in transactions with Vincler & Knoll. Vincler & Knoll's claim is to a distribution from Paul's (their judgment holder) claim which is itself derivative through other entities. Paragraph 8 of Vincler & Knoll's claim states "Vincler & Knoll has a valid claim against Paul who has a valid claim against Atlantic who has a valid claim to the SMP Escrow Fund" which is an asset of the Debtor's estate. (Proof of Claim Addendum filed June 2, 1998). A similar derivative claim was filed by Vincler & Knoll against the Class 3 Plan Fund, sometimes referred to as the "TSM" Escrow Fund. See ¶ 13 of the Proof of Claim Addendum. A "creditor" is defined by the Bankruptcy Code as an "entity that has a claim *against the debtor....*". 11 U.S.C. § 101(10)(A)(emphasis added). An entity with a "derivative, indirect" claim does not fall within this defi-

---

1. The court's jurisdiction was not at issue. This Memorandum Opinion constitutes our findings of fact and conclusions of law.

2. Since the sale hearing, Debtor has disbursed or is in the process of disbursing all funds in the estate to the creditors of the estate. None will be paid to Vincler & Knoll or Charles Knoll as Trustee for the Ted Paul judgment.

nition of "creditor".[3] Thus, neither Vincler & Knoll nor Charles Knoll as Trustee for the Judgment of Ted Paul is a creditor of this estate. Moreover, even if Lampl's clients were creditors of this estate § 506(c) does not permit this fee to be paid to Lampl for the reasons articulated in the Memorandum Opinion and Order of November 5, 1998.

The allegation at ¶ 7 of the Motion that Mr. Lampl was "solicited and encouraged to seek such a [broker's] fee by a representative of Second Mortgage Partners and representatives of the Debtor and also ... realized that his efforts had directly created an additional fund in excess of $600,000 which went directly to the benefit of Second Mortgage Partners" is irrelevant[4] to whether he has a legal entitlement to a broker's fee. In addition, the transcript of the sale shows that the original bidder had agreed to pay any real estate commission if he was successful. Sale Hearing Transcript, March 13, 1998, page 8, lines 5–13. In order to compare bids to determine the highest and best offer, the court required specification of the components of each bid. Had Lampl sought a commission at the hearing, rather than assuring the court that he did not seek one, the entire bid process would have differed.

It is disingenuous, at best, for Lampl to make this request for a $36,000 fee when he objected to any proposed commission for Mericle Commercial based on his assertion at the sale hearing that another person produced a buyer based on a prepetition agreement

> ... and maybe that buyer did agree to a brokerage commission. However, he's not identified anywhere. No one knew about it. All we know is there's a $50,000 commission, there's been no application to the Court, and ... for the whole pendency of this five week case, that the sign on that building says "Sale Pending" and the mul-

ti-lists regarding this building says [sic] "Sale Pending".

Sale Hearing Transcript at 32, lines 14–21.

Lampl later induced this court to permit his client to craft its own offer rather than to bid against the contract with the initial offeror, because of, *inter alia,* the five percent broker's commission. *Id.* at 55, line 24; at 57, line 10; at 66 lines 21–25. Thus, Lampl's client's offer did not include payment of a broker's commission because Lampl disavowed an intention to seek one. This court and the bidders at the sale relied on his statement and he has waived and/or is estopped from claiming a commission from this estate now.

Regarding ¶¶ 10–14 of the Motion, as noted in note 9 of the Memorandum Opinion of November 5, 1998, this court has never received a proposed "settlement"—only a proposed order to approve an unfiled and unspecified settlement. This Motion for Reconsideration fails to constitute a settlement agreement and is not a motion to approve a settlement. It should not be a surprise to Movant that this court would not sign a proposed order approving an unknown course of action.

Finally, regarding the disparaging language in ¶ 9 of the Motion, the only "extraneous" matter that "clutters the record" are certain allegations in this Motion.

For these reasons, the Motion for Reconsideration is **DENIED.**

---

**3.** These claims were contingent and disputed by several parties in interest.

**4.** Moreover, the statement is factually incorrect. The $600,000 does not inure *exclusively* to Second Mortgage Partners under the confirmed plan. Unsecured creditors will also benefit. And, since the initial bid was $1,000,000 and the accepted bid was $1,600,000, mathematically, the "additional fund" cannot be "in excess" of $600,000.